J-S21002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN RE: INVOLUNTARY TERMINATION OF: J.I.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.L.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 222 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2022-01046

| IN RE: INVOLUNTARY TERMINATION OF: U.T.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.L.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 223 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2022-01047

| IN RE: INVOLUNTARY TERMINATION OF: D.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.L.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 224 MDA 2023 |

Appeal from the Decree Entered January 9, 2023
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2022-01045

J-S21002-23

BEFORE:   BOWES, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                          **FILED: AUGUST 9, 2023**

C.L.S. ("Mother") appeals the January 9, 2023 decrees involuntarily terminating her parental rights to her sons, J.I.A. and U.T.A., born respectively in June 2009 and March 2011, and her daughter, D.M.M., born in August 2020.[1]  After careful review, we affirm.

We glean the factual and procedural history of this matter from the certified record, which the orphans' court has summarized, as follows:

> Mother is the natural mother of J.I.A., U.T.A., and D.M.M.  [U.S.A., Jr. ("Father") is the father of U.T.A. and J.I.A., while t]he father of D.M.M. is unknown . . . .[2/3]
>
> [Lebanon County Children and Youth Services ("CYS" or "the agency")] first became involved with the family on August 16, 2020, due to Mother's substance use and mental health behavior issues.  On that date, Mother went into a hospital with D.M.M. and J.I.A., and was acting erratically, hallucinating, and winging D.M.M. around.  The hospital tested Mother because of her erratic behaviors.  Mother tested positive for methamphetamine.  D.M.M. was one week old at the time.  Emergency custody of D.M.M. was granted to CYS, and she was placed into foster care.  On August 18, 2020, a shelter care hearing was held for D.M.M.  [She] was adjudicated dependent on September 14, 2020.  Mother signed over guardianship of J.I.A. and U.T.A. to S.M., a family friend.  The

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  Mother has two other children who are not the subject of the instant appeal.

[2]  The termination decree with respect to D.M.M. also terminated the rights of any unknown father.  No such individual has ever come forward.

[3]   On the same day, the orphans' court also entered decrees terminating Father's parental rights to U.T.A. and J.I.A.  Father filed appeals at 182 and 183 MDA 2023, which we have addressed in a separate writing.

agency opened a case for all of the children in November 2020. At that time, Father was [living apart from the family in New York], Mother's whereabouts were unknown, and the case was being monitored by the agency.

Concerns for truancy arose later in January 2021. Mother became involved but then left the state. On January 20, 2021, concerns arose about S.M. regarding suspected drug use, home conditions, and that she refused to drug test when requested. The agency requested emergency custody of U.T.A. on January 26, 2021[, which was granted the same day.] On January 28, 2021, a shelter care hearing was held for U.T.A. The agency filed a dependency petition on February 2, 2021, and U.T.A. was adjudicated dependent on February 8, 2021. [At this time, Mother's whereabouts were unknown to the agency, although she was suspected to be in New York with Father.]

Thereafter, during the summer of 2021, the agency received reports that J.I.A. was back in Pennsylvania at the maternal grandmother's home; however, the agency could not confirm these reports. Father and Mother alleged that J.I.A. was in New York with a relative. The relative, however, denied having J.I.A[.]

The agency located J.I.A. at his football game on September 17, 2021. The same day, the agency was awarded emergency custody of J.I.A. He was placed into a kinship foster home with his football coaches[.] On November 29, 2021, J.I.A. was adjudicated dependent[.]

[The orphans' court initially established a permanency goal of reunification with respect to D.M.M., U.T.A., and J.I.A. Mother was assigned numerous objectives including, *inter alia*, obtaining suitable housing, finding stable employment, submitting to regular drug tests, and following-up on pertinent recommendations with respect to her mental health and addiction issues. **See** N.T., 1/9/23, at 21-22; **see also** CYS Exhibit 3 (permanency plan for J.I.A.), CYS Exhibit 4 (permanency plan for U.T.A.), CYS Exhibit 5 (permanency plan for D.M.M.).]

. . . .

> On December 20, 2022, petitions for involuntary termination of parental rights were filed by the agency.[4]  On January 9, 2023, the court held a termination hearing.  As of the date of the hearing, D.M.M. had been in placement for approximately twenty-nine months (*i.e.*, nearly her entire life), U.T.A. had been in placement for approximately twenty-four months, and J.I.A. was in placement for approximately sixteen months.  [The agency adduced testimony from CYS foster care supervisor Angelica Farrisi.  Although Mother] attended the hearing, . . . she was . . . unwilling to participate, walked out multiple times, and eventually left the [courthouse] entirely.

Orphans' Court Opinion, 3/3/23, at 4-6 (cleaned up).

The same day, the orphans' court entered decrees terminating Mother's parental rights to U.T.A., J.I.A., and D.M.M. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  The court also entered orders changing each child's permanency goal from reunification to adoption.

On February 6, 2023, Mother filed separate, timely notices of appeal at the captions above, along with concise statements of error complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).  Thereafter, the court authored a joint Rule 1925(a)(2)(ii) opinion setting forth its findings with respect to the termination decrees as to U.T.A., J.I.A, and D.M.M.  This Court *sua sponte* consolidated the above-captioned cases pursuant to Pa.R.A.P. 513.

---

[4]  On December 20, 2022, the orphans' court appointed a guardian *ad litem* and separate legal counsel to represent, respectively, the best interests and the legal interests of D.M.M., U.T.A., and J.I.A.  **See** 23 Pa.C.S. § 2313(a). Legal counsel for the children has filed a brief in this Court advocating that the orphans' court's termination decrees be affirmed.

- 4 -

Mother has raised a single issue for our consideration: "Whether the [orphans'] court erred when it entered [decrees] on January 9, 2023 terminating [Mother's] parental rights?" Mother's brief at 5.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by 23 Pa.C.S. § 2511 of the Adoption Act, which necessitates a bifurcated analysis

that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination pursuant to § 2511(a)(1)-(11). *Id*. at 830. If the orphans' court determines that a petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition under 23 Pa.C.S. § 2511(b), which focuses upon the child's developmental, physical and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, *supra* at 267.

In the instant case, the orphans' court found that termination was appropriate pursuant to § 2511(a)(1), (2), (5), and (8) and § 2511(b). Our implicates § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 6 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In order to satisfy § 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least twelve months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Furthermore, termination pursuant to § 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal or placement of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). Furthermore, when proceeding pursuant to § 2511(a)(8), we need not consider "any efforts by the parent to remedy the conditions" that were "first initiated subsequent to the giving of notice of the filing of the [termination] petition." 23 Pa.C.S. § 2511(b). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009).

This Court has acknowledged:

[T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems

- 7 -

that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*Id.* at 11-12 (emphasis in original) (cleaned up).

This Court has also explained that,

while both § 2511(a)(8) and § 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to § 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by § 2511(b); as such, they are distinct in that we must address § 2511(a) before reaching § 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*) (cleaned up).

If a petitioner establishes adequate grounds for termination pursuant to § 2511(a), the court turns to § 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, ___ A.3d ___, 2023 WL 4092986 at *13 (Pa. June 21, 2023). This determination "should not be applied mechanically," but "must

be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at *14. Accordingly, as our Supreme Court has recently explained, there is no "exhaustive list" of factors that must be considered in this context. *Id*. at *18 n.28.

Since its holding in *In re E.M.*, 620 A.2d 481 (Pa. 1993), our Supreme Court has mandated that a court's § 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *T.S.M.*, *supra* at 267. Thus, the court must determine whether the "trauma" caused by sundering the parent-child bond is "outweighed by the benefit of moving the child toward a permanent home." *Id*. at 253 (cleaned up). Specifically, the recognized threshold for this finding is that the court must determine whether termination will sever a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." *K.T.*, *supra* at *16. Our Supreme Court has emphasized, however, that such consequences must constitute more than mere proof of "an adverse or detrimental impact from severance of the parental bond" in order to preclude termination. *Id*. at *18. Thus, "courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's 'feelings' or 'affection' for the parent, which even badly abused and neglected children will retain." *Id*. at *16 (citing *T.S.M.*, *supra* at 267).

Our case law reflects that a court's analysis pursuant to § 2511(b) is not narrow but must include consideration of "intangibles such as love, comfort,

security, and stability." ***T.S.M.***, ***supra*** at 267. Indeed, our Supreme Court has affirmed that "the parental bond is but one part of the overall subsection (b) analysis." ***K.T.***, ***supra*** at \*18. Thus, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." ***K.T.***, ***supra*** at \*17 (cleaned up). In conformity with this instruction, our Supreme Court has noted that Pennsylvania courts should also consider, where appropriate pursuant to the particular facts of a case, related factors such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. ***Id***. at \*18.

With these overarching legal principles in mind, we turn to Mother's arguments. Although broadly framed and troublingly succinct, we discern that her argument consists of two allegations: (1) that there was insufficient evidence to find grounds for termination pursuant to § 2511(a); and (2) that the severing of Mother's parental rights would have a "detrimental effect" upon J.I.A., U.T.A., and D.M.M., such that termination should be precluded pursuant to § 2511(b). ***See*** Appellant's brief at 9-11 ("[Mother] has worked to the best of her ability to fulfill her goals and consistently maintained her desire to resume the parental responsibilities for her children. . . . To sever that bond, [Mother] argues would have a detrimental effect on the children.").

We will address each of these claims, beginning with the orphans' court's § 2511(a) analysis.

The orphans' court's relevant findings pursuant to § 2511(a)(8) began by noting that J.I.A., U.T.A., and D.M.M. had been in placement for at least twelve months prior to the filing of a termination petition. ***See*** Orphans' Court Opinion, 3/3/23, at 21 ("[A]s of January 9, 2023, D.M.M. had been in placement for approximately twenty-nine months (nearly her entire life), U.T.A. had been in placement for approximately twenty-four months, and J.I.A. had been in placement for approximately sixteen months." (cleaned up)). The orphans' court also concluded that the conditions that had precipitated removal continued to exist. ***Id***. at 8-9 ("The serious reasons for why [J.I.A., U.T.A., and D.M.M.] were placed continued to exist, including concerns about housing, the ability to provide financially, lack of ability to do drug tests, and mental health [concerns]."). Finally, the orphans' court found that termination would ultimately serve the needs and welfare of J.I.A., U.T.A., and D.M.M. ***Id***. at 26-27 ("[Mother does] not contribute positively towards the psychological health of [the children]."). In reaching these conclusions, the orphans' court relied principally upon the testimony of Ms. Farrisi, who was the foster care supervisor assigned to this family by CYS. ***See*** N.T., 1/9/23, at 5-6. Our review confirms that her testimony supports the orphans' court's conclusions with respect to § 2511(a)(8).

Initially, Ms. Farrisi testified regarding the respective placement terms of the J.I.A., U.T.A., and D.M.M., which were all in excess of twelve months as set forth by the orphans' court. *Id*. at 21, 34. There is no dispute these placements satisfy the twelve-month threshold pursuant to § 2511(a)(8).

With respect to the removals that occurred in the above-captioned cases, Ms. Farrisi testified that D.M.M. was removed in August 2020 after Mother presented to a hospital with substance abuse and mental health issues within one week of D.M.M.'s birth. *See* N.T., 1/9/23, at 6-7. She stated that U.T.A. and J.I.A. resided with maternal grandmother and, then, S.M. *Id*. at 8-9, 15. However, she explained that both guardianships were deemed to be unsuitable due to concerns regarding illicit narcotics. *Id*. CYS was awarded emergency custody of U.T.A. in January 2021 due to the ongoing lack of a suitable home. *Id*. at 15. At that time, Ms. Farrisi reported that J.I.A.'s whereabouts were unknown to CYS and neither parent would cooperate with their efforts to find him. *Id*. at 16-17. Ultimately, J.I.A. was located and placed in foster care in September 2021, when he was found to be living in a hotel. *Id*. at 18.-19.

Ms. Farrisi also averred that, in connection with these removals, the permanency goal established with respect to each child was initially reunification and required Mother to, *inter alia*: (1) obtain suitable housing; (2) find stable employment; (3) submit to regular drug tests; and (4) follow-up on pertinent recommendations with respect to her mental health and

addiction issues. *Id*. at 21-22; *see also* CYS Exhibit 3 (permanency plan for J.I.A.), CYS Exhibit 4 (permanency plan for U.T.A.), CYS Exhibit 5 (permanency plan for D.M.M.).

Although Ms. Farrisi allowed that Mother had made "moderate" progress on these goals, she concomitantly testified that Mother largely failed to comply with these permanency directives and, thereby, failed to address the circumstances that first caused the removal of D.M.M., U.T.A., and J.I.A. Specifically, she reported that Mother never obtained verifiable housing or stable employment prior to the filing of the termination petitions. *Id*. at 27-30, 37. Furthermore, Ms. Farrisi testified that Mother refused to participate in the court-mandated drug testing regimen until just two days before the termination hearing. *Id*. at 29-30. Additionally, she also noted that Mother failed to follow-through with the "recovery support services" recommended following her completion of a drug and alcohol evaluation. *Id*. at 29, 38.

Finally, Ms. Farrisi also testified concerning whether termination would ultimately serve the interests and welfare of D.M.M., U.T.A., and J.I.A. Specifically, she averred that J.I.A.'s, U.T.A.'s, and D.M.M's respective need for stability and permanency would be best served by terminating Mother's parental rights. *Id*. at 40. Her conclusion on this point is also further buttressed by the long duration of the respective placements of each child,

the longest of which began at D.M.M.'s birth and continued for over twenty-nine months prior to the filing of a termination petition.[5]  *Id*. at 21, 34.

Based on the foregoing, we find ample support for the orphans' court's conclusions pursuant to § 2511(a)(8), namely, that D.M.M., U.T.A., and J.I.A.: (1) have each been in placement for at least twelve months of time; (2) the conditions that precipitated their removal continue to exist; and (3) termination of Mother's parental rights will best serve the needs and welfare of J.I.A., U.T.A., and D.M.M.  Accordingly, we will turn our review to the orphans' court's findings pursuant to § 2511(b).

Although we reiterate that Mother's arguments border on cursory, we are able to discern that she is essentially averring that severing her alleged parental bond with J.I.A., U.T.A., and D.M.M. will have a "detrimental" effect upon them and, thus, should not be allowed.  Mother's brief at 11.

Preliminarily, we note that Mother's arguments misapprehend the nature of the bond analysis required by § 2511(b).  As our Supreme Court recently pronounced in **K.T.**, indicia of a "detrimental" effect to a child stemming from the termination of parental rights is **not** the correct touchstone in this arena.  **See K.T.**, **supra** at *16.  Rather, there must be "extreme emotional consequences" in order to preclude termination.  **Id**.  Thus, to the

---

[5]  As discussed more fully in our discussion of § 2511(b), the children are all in pre-adoptive foster homes that are meeting their respective needs.

extent that Mother asserts that the effects of severing the bond will be "detrimental" to D.M.M., U.T.A., and J.I.A., such arguments miss the mark.

Pursuant to § 2511(b), the orphans' court acknowledged that Mother shared a bond with D.M.M., U.T.A., and J.I.A., but found that those bonds were not "necessary or beneficial." Orphans' Court Opinion, 3/3/23, at 27. Rather, the court concluded that termination would serve the "needs and welfare" of J.I.A., U.T.A., and D.M.M. by providing them with much-needed permanency and stability. *Id*. at 27-28. The court also found termination appropriate given that each child was residing in pre-adoptive foster homes, wherein they had bonded with their foster parents and were "doing well." *Id*. The court also found that termination would serve the "best interests" of J.I.A., U.T.A., and D.M.M. due to Mother's ongoing lack of housing, employment, or progress on her mental health and addiction issues. *Id*. at 28.

Again, the testimony of Ms. Farrisi supports the court's conclusions. Although Ms. Farrisi allowed that Mother shared a bond with each of the children, she opined that these connections were not parental or positive:

Q. What about all three children's relationship with [Mother]? How do they interact or bond with her?

A. I would say they're bonded. I think each child has a different take on the situation and on their relationship with her. I know [D.M.M.] knows her as Mommy, but she doesn't have a strong bond, I would say, towards distinguishing her as the only mother figure.

As far as [J.I.A.], I would say he's bonded to [Mother]. I think it's maybe more of the friendship level.

And with [U.T.A.], I would say there's definitely a lot of hurt from [Mother] and some disappointed there with the relationship.

N.T., 1/9/23, at 33-34. In describing these bonds, Ms. Farrisi also noted that both J.I.A. and U.T.A. have expressed disappointment concerning Mother's spotty participation and inappropriate behavior at weekly, supervised visitations.[6] *Id*. at 51-52. They also shared their reluctant desire to be adopted. *Id*. at 40. Additionally, Ms. Farrisi reported that D.M.M., U.T.A., and J.I.A. are all thriving in their respective foster placements and are bonded with their pre-adoptive foster families. *Id*. at 20-21.

Based on the foregoing, we find that the orphans' court's relevant findings pursuant to § 2511(b) are supported by the record. Instantly, the court found that J.I.A.'s, U.T.A.'s, and D.M.M.'s developmental, physical, and emotional needs and welfare would be best served by terminating Mother's parental rights due to: (1) the lack of a parental bond with Mother; (2) the continued lack of housing, absence of financial support, and drug-related concerns; and (3) the stability and permanency offered by the preadoptive foster families with whom D.M.M., U.T.A., and J.I.A. are currently residing. *See* Orphans' Court Opinion, 3/3/23, at 27-28. As detailed above, Ms. Farrisi's undisputed testimony fully supports these conclusions.

---

[6] Of note, Ms. Farrisi also testified that Mother never progressed beyond supervised visitations. *See* N.T., 1/9/23, at 29.

Pursuant to the reasoning set forth above, we find that Mother's claim for relief lacks merit. Thus, we will affirm the decrees terminating her parental rights to D.M.M., U.T.A., and J.I.A.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2023