J-S12030-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO G.M.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3190 EDA 2025 |
| | : | |

Appeal from the Decree Entered November 6, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2025-0030

BEFORE:   McLAUGHLIN, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                **FILED MAY 22, 2026**

D.L.C. ("Mother") appeals from the decree terminating her parental rights to her daughter, G.M.O. ("Child") upon petition of the Lehigh County Office of Children and Youth Services ("LCOCYS" or "the Agency").  We affirm.

When Child was born in March 2023, she and Mother tested positive for methamphetamines and marijuana.  The Agency took custody of Child and placed her in foster care.  The next month, Child was adjudicated dependent. The Orphans' Court returned Child to Mother under a protective order requiring her to live with an agreed-upon kinship resource, who would supervise Mother's contact with Child; Mother also agreed to submit to urine tests.  Mother was also assigned a series of tasks that required her to: 1) get a job and stable housing, 2) complete a mental health evaluation, 3) complete

_____

[*] Retired Senior Judge assigned to the Superior Court.

a drug and alcohol evaluation, 4) submit urine screens eight to nine times per month, and 5) agree to be supervised in all contact with Child.

Mother appeared for six consecutive urine screens but then became inconsistent with her attendance. In July 2023, Mother tested positive for illicit substances and her kinship resource asked her to leave the home. In September 2023, the court removed Child from Mother's care. Child remained in kinship care until January 2024, when she was placed with a foster family, a pre-adoptive source where she still lived at the time of the September 2025 hearing.

In May 2025, the Agency filed a petition to terminate Mother's parental rights; the Orphans' Court held a hearing on the petition in September 2025.[1] At the hearing, Alex Skinner ("Mr. Skinner"), the Area Manager for Pennsylvania through AverHealth, testified that from March 2023, to May 2025, Mother had multiple positive tests for opiates, as well as others for methamphetamine and THC and a number of "no-shows." **See** N.T., 9/8/25, at 14-22. Shannon Spencer ("Ms. Spencer"), AverHealth Laboratory's site director, confirmed Mother had a series of positive tests, twenty-five no-shows between April and August 2023, thirty no-shows between September and December 2023, 42 no-shows between December 2023 and June 2024, ten

_____

[1] Father did not appear at the termination hearing and has not participated in this case. His counsel filed an application to withdraw, which this Court granted on February 20, 2026.

no-shows between October 2024, and March 2025, and ten no-shows from March to June 2025. ***See id***. at 25-40.

Jared Case ("Mr. Case"), a caseworker at the Agency, testified he met with Mother shortly after Child's birth and found her verbally aggressive and unwilling to submit to drug and alcohol testing. ***See id***. at 45-49, 82-83. Mr. Case also detailed Mother's and Child's placement in kinship care, and her receipt of the Agency's recommendations. ***See id***. at 51-57. Mr. Case also testified Mother did not have a mental health evaluation or therapy but only medication management and did not consistently appear for drug screening. ***See id***. at 58-65. At the time of the January 2024, status hearing, Mother was rated as minimally compliant: she had not obtained employment, a mental health evaluation, or a new drug and alcohol evaluation. ***See id***. at 67-68, 86.

Genesis Frias ("Ms. Frias"), a caseworker at the Agency, testified to the following: as of June 2024, Child was doing well with her foster family, which was doing its best to assist with Mother's visits with Child. ***See id***. at 90-93. Mother was then renting a room in a rowhouse owned by "Rock"[2] in which other people also resided; the house was appropriate for Mother but not Child. Mother had not completed a mental health evaluation, despite claiming she had. ***See id***. at 93-98. Mother took no responsibility for her problems, choosing instead to blame the Agency and everyone other than herself for her

_____

[2] Rock's real name was Rochester Davis. Davis had a history of housing people with histories of substance abuse and/or domestic violence. ***See id***. at 132.

- 3 -

problems; a drug and alcohol facility later discharged her for non-compliance. ***See id***. at 98-99.

Ms. Frias testified that as of October 2024, Child was bonding with her foster family and Mother was incarcerated. ***See id***. at 102-05. Mother again claimed to have had a mental health evaluation but never produced it. ***See id***. at 105-08. Ms. Frias testified that as of January 2025, Child was thriving in placement and bonding with family members. ***See id***. at 114-15. Mother had not had a mental health evaluation, engaged with mental health services, or submitted recent urine samples. ***See id***. at 116-20.

Ms. Frias testified that as of March 2025, Child was thriving in foster care, and Mother was re-incarcerated following a prior release. ***See id***. at 130-31. In June 2025, Ms. Frias found Child further bonded with her foster family; Mother was out of prison and renting a larger room from Rock. ***See id***. at 136-37, 144-45. Mother reported briefly holding a series of jobs, and she had not had a mental health evaluation (despite saying she had) or received mental health treatment. ***See id***. at 139-42, 176. Mother cancelled two visits with Child due to a vacation and fell asleep during other visits. ***See id***. at 142, 158. Mother had made moderate progress toward alleviating the circumstances that necessitated the original placement but was far from completing all of her recommendations. ***See id***. at 176-79. Ms. Frias did not believe reunification was possible at the time of the hearing because Mother's housing was not suitable for Child and Mother was not consistent with drug

treatment. On those bases, Ms. Frias opined termination would best serve Child's needs. *See id*. at 147-48.

Alyssa Deeble ("Ms. Deeble"), a family worker for Lehigh Valley Families Together ("LVFT"), was assigned to the family upon Child's birth to help Mother with her goals. *See id*. at 183-85. Ms. Deeble prepared reports concerning her work with Mother from January 2024 until May 2025. *See id*. at 188-94. Ms. Deeble attempted to facilitate Mother's receipt of mental health treatment but never received confirmation Mother had a mental health evaluation. *See id*. at 194-96. Ms. Deeble testified it took Mother nearly two years, from October 2023 to June 2025, to comply with her substance abuse recommendations. *See id*. at 197-98. Ms. Deeble gave Mother a list of landlords and housing resources that Mother apparently did not pursue. *See id*. at 198-99. Ms. Deeble did not view Mother's housing as compatible with reunification. *See id*. at 199-200. Mother had a series of short-term jobs and had a new job as of July 2025. *See id*. at 200-03. Ms. Deeble testified Mother fell asleep on four separate, supervised visits with Child,[3] and Mother cancelled a total of twenty-one of 88 scheduled visits. *See id*. at 203-05, 214.

Mother testified she fell asleep during those visits because she was tired from her job managing two Pizza Huts. *See id*. at 219-25. Mother asserted she had participated in a series of drug and alcohol evaluations. *See id*. at

_____

[3] The court also noted Mother appeared to be falling asleep during the hearing. *See id*. at 211.

225-26. Mother said she mistakenly believed her intake evaluations at various facilities constituted mental health evaluations. *See id*. at 238-42, 247-50. At the conclusion of the hearing, Child's GAL argued in favor of termination and adoption. *See id*. at 271-75. The Orphans' Court held the case under advisement.

On November 6, 2025, the Orphans' Court entered an order terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), and (b). Mother timely appealed and complied with Pa.R.A.P. 1925(b)(2)(i), and the Orphans' Court filed an opinion.

Mother raises the following question for our review:

> Whether the [Orphans' Court] erred or abused its discretion by terminating Mother's parental rights to the children [sic] pursuant to 23 Pa.C.S.[A.] Section 2511(a)(1), [(a)(2),] (a)(5), or (a)(8)[,] and finding that it was in the best interest of the children [sic]?

Mother's Brief at 8 (unnumbered).

Mother asserts although she still had issues to work on to be able to parent Child, she had made progress and the evidence was not so clear and convincing as to support the termination of her parental rights. *See* Mother's Brief at 13.

Our standard of review is as follows:

> [I]n cases involving involuntary termination of parental rights[, our review] is limited to determining whether the trial court's determination is supported by competent evidence. When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. Where the trial court's factual findings are supported by the evidence, an

appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. It matters not that an appellate court might have reached a different conclusion, as it is well-established that absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.

*In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (internal citations omitted).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the Orphans' Court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). *See id*. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

Instantly, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Because we need only affirm on one of the grounds in Section 2511(a), we review Mother's challenges to termination pursuant to subsections (a)(8) and (b), which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * * *

- 7 -

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy section 2511(a)(8), the petitioner must prove: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child.  *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child.  *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017).  Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time

of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009). This Court has acknowledged:

> [T]he application of [s]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

***Id***. at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has also explained that,

> while both section 2511(a)(8) and section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as prescribed by section 2511(b); as such, they are distinct in that we must address section 2511(a) before reaching section 2511(b).

***In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

Mother admits Child was removed from her care for more than twelve months due to, *inter alia*, her use of controlled substances and mental health concerns, but asserts she has exercised supervised visits with Child and "attempted to maintain a semblance of the mother/child relationship." Mother's Brief at 17.

In the instant matter, the Orphans' Court explained, Child had been removed from Mother for longer than the twelve-month period pursuant to Section (a)(8): she was "continuously in the Agency's care until the termination hearing that occurred two years later[.]" Orphans' Court Opinion, 11/6/25, at 11.   The Orphans' Court further stated:

> Despite extensive services the Agency tried to provide to Mother across this two-year period, Mother has not been willing or able to correct the issues that caused the Agency to remove Child from her care; namely, her need of drug and alcohol and mental health treatment.  She has not remedied matters within a reasonable period of time.  Nothing in the record leads the Court to believe that more time or access to more services will enable Mother to overcome the barriers that have prevented her from reunifying with Child within a reasonable period of time.  Child required consistent parental care, stability, and permanency, which Mother has not provided.  Child's needs and welfare are best served by termination of Mother's parental rights so she can achieve permanency and maintain the stability her foster parents have provided since she was placed with them . . . approximately [twenty] months before the termination hearing.  Child's foster family addresses all of the Child's needs and is prepared to adopt Child if parental rights are terminated.  Mother failed to address within a reasonable period of time the underlying problems which caused the Agency to become involved when Child was born. . ..

*See* Orphans' Court Opinion, 11/6/25, at 11.  Elsewhere in its Opinion, the court stated Mother "failed to consistently demonstrate sobriety by attending urine screens, did not obtain a mental health evaluation, and did not consistently get the substance abuse treatment she needed."  *See id*. at 3.[4]

---

[4] The Orphans' Court recognized Mother had a single substance abuse evaluation in 2024, but found she failed to engage in effective drug treatment. *See id*. at 5.  It further noted she did not consistently participate in drug tests until *after* the Agency filed its termination petition.  *See id*. at 6.

The Orphan's Court, which saw Mother over the course of the dependency and termination case, also concluded Mother had employed a "mirrors and smokescreens routine" with the Agency, **see id**., by repeatedly falsely claiming she had mental health evaluations, and mischaracterizing her appointments to receive medication as mental health evaluations and mental health treatment. **See id**. at 4.[5]

The record supports the trial court's determination. Mother did not dispute that Child has been removed from her care for at least twelve months. Additionally, two years after Child had been placed with a foster family, Mother still had not made substantial progress toward solving her drug, alcohol, and mental health issues, having missed myriad drug screens; and it further found termination clearly in Child's best interest, given her rich bond with her foster family. **See J.N.M.**, 177 A.3d at 943.[6] Plainly, reunification was not imminent at the time of the hearing. **See In re I.J.**, 972 A.2d at 11. For these reasons, we discern no abuse of discretion by the court in concluding the termination

---

[5] Reasoning that Mother's professional work experience demonstrated her intelligence, the court believed Mother "attempt[ed] to deceive" when she characterized herself as confused as to what constituted mental health treatment. **See id**. at 4-5.

[6] Although Mother became more compliant with drug testing *after* the Agency filed of the petition, she offered no evidence that improvement occurred before that date. Accordingly, we may not consider post-petition progress. **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010 (citing 23 Pa.C.S.A. § 2511(b)).

of Mother's parental rights will best serve Child's needs and welfare pursuant to section 2511(a)(8).

Having found sufficient grounds for termination pursuant to section 2511(a)(8), we must next determine whether termination was proper under section 2511(b). Section 2511(b) affords primary consideration to the developmental, physical, and emotional needs and welfare of the child. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Regarding the section 2511(b) best interest analysis, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the [Orphans' C]ourt must examine the status of the bond to determine whether its termination would destroy an existing, necessary[,] and beneficial relationship. . . .
>
> In addition to a bond examination, the . . . court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotations, brackets, and indentation omitted).

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond

analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Furthermore, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

As our Supreme Court recently explained in *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023),

> a court conducting a [s]ection 2511(b) analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

In addition, the **K.T.** Court explained that the inquiry must consider and weigh certain evidence if it is present in the record, including, but not limited to, the child's "need for permanency and length of time in foster care . . .; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id**. (footnote omitted).

> Regarding section (b), Mother asserts:
>
> There is no doubt that there are justifiable concerns about [Child] having stability in her life. There is no doubt that [M]other could have done things better to try and reestablish the family unit. However, the evidence simply did not support a finding that the relationship between [Child] and [M]other was so tenuous or stunted that it should be cut off. There was still the strong bond between [Child] and [M]other[,] and the termination of her parental rights was an abuse of discretion.

Mother's Brief at 19.

The Orphans' Court found Child's needs "have been ably met by her foster family since her placement[.]" **See** Orphans' Court Opinion, 11/6/25, at 12. The court noted Child looks to foster parents to meet all her needs and has a close bond with foster parents and their son, whom she "adores," and Child "has totally integrated into the foster family." **See id**. The court further noted Mother has not progressed beyond supervised visits. It explicitly found "the bond Child has with her foster family is stronger and more important to her well-being and development that the bond she has with Mother[.]" **Id**. at

13. The court stated Child considers foster parents to be her parents and the benefits of permanency outweigh the bond she has with Mother. *See id*.

On this record, the trial court's determination was not an abuse of discretion. Although Mother testified she had an affectionate bond with Child, the evidence showed Child's parental bond was with her foster parents. Child's GAL argued in favor of a termination of Mother's parental rights and a caseworker testified that result would best serve Child's interests, which are paramount. We cannot disregard the facts Child is in a pre-adoptive home and foster parents are far better able than Mother to satisfy Child's tangible and intangible needs.

Based on the foregoing, we affirm the decree involuntarily terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/22/2026